UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  05-206-02 (EGS) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DENISE GREENE, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MOTION FOR GUIDELINES CREDIT AND
MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves the Court, pursuant to § 3E1.1(a) & (b) of the Sentencing Guidelines, to adjust the Defendant's offense level down three levels reflecting the Defendant's acceptance of responsibility for this offense.  The United States also submits this memorandum in aid of sentencing.

**I.    BACKGROUND**

The Defendant was charged in a fourteen-count indictment with distributing a total of approximately 220 grams of cocaine base on seven separate occasions, each time within 1000 feet of a school, between February 16, 2005, and May 12, 2005.  On February 16, 2007,  the Defendant pled guilty to count nine of the Indictment.  At that time the Defendant admitted to the following:

On April 5, 2005, at approximately 4:40 p.m., a cooperating source ("source") who was working with agents from the United States Park Police ("USPP") called Defendant Greene on the telephone to discuss purchasing two ounces of cocaine base from the Defendant's co-Defendant, Houston Quildon ("Quildon").  During the telephone conversation, the source asked the Defendant

1

to call Quildon in order to inquire about the price of cocaine base, and to arrange a meeting the next day in order for the source to purchase the cocaine base from Quildon. The Defendant agreed to do so, and the telephone conversation ended.

Thereafter, the source called the Defendant again. During this second telephone conversation, the Defendant indicated that she had talked to Quildon, and she had arranged for Quildon to meet the source the next day, April 6, 2005. The Defendant said that she had told Quildon that the source "wanted to double-up," she had "asked for the same price," and she had reminded Quildon that the price was "nine." The source explained that Quildon had only given him 25 or 26 grams last time, and the source told the Defendant that he did not want anything less than "a deuce" this time. The Defendant said, "okay," and told the source that Quildon was going to come to the Defendant's house, so the Defendant would be able to tell Quildon more in person, and the Defendant would "make sure everything is straight."

The next day, April 6, 2005, at around 4:30 p.m., the source went to the Defendant's home located at 1527 12th Street, Northwest, where he met the Defendant. Shortly thereafter, the source and the Defendant walked to a laundromat located on 11th Street and Rhode Island Avenue, Northwest. Quildon drove into the parking lot of the laundromat, and the source got into Quildon's vehicle, where the source purchased two bags which contained a white, rock-like substance in exchange for $1,800.00 in pre-recorded USPP funds. Thereafter, a USPP agent took custody of the substance that had been purchased from Quildon. That substance was later submitted to the Drug Enforcement Agency's laboratory where chemical analysis determined that the substance was cocaine base, with a net weight of 54.9 grams.

On six (6) other separate occasions, the source contacted the Defendant by telephone to

discuss the purchase of cocaine base from Quildon. During these six (6) telephone conversations, the Defendant agreed to contact Quildon on the source's behalf in order to arrange the purchase of cocaine base. Following each of these six (6) telephone conversations, the source would meet Quildon at either the Defendant's home at 1527 12th Street, Northwest, or at a laundromat located at 11th Street and Rhode Island Avenue, Northwest, and the source would purchase a quantity of crack cocaine base from Quildon. The combined net weight of these six purchases of crack cocaine base is 167.2 grams.

## II.   SENTENCING CALCULATION

### A.   Statutory Minimums and Maximums

Pursuant to Title 18, United States Code, Section 3583 and Title 21, United States Code, Section 841(b)(1)(A)(iii), the charge carries a maximum sentence of life imprisonment, a mandatory minimum sentence of 10 years of imprisonment, a fine of up to $4,000,000.00, a special assessment of $100.00, and up to five years of supervised release.

### B.   Sentencing Guidelines Calculation

The Guidelines calculation utilized in the Presentence Investigation Report ("PSR") calculates the Defendant's total offense level at 24. See PSR ¶ 47. The PSR calculates the Defendant's criminal history as Category I. See PSR ¶ 27. Therefore, the PSR calculates the Guideline range for the Defendant at 51 to 63 months. See PSR ¶ 47.

## III.   GOVERNMENT'S RECOMMENDATIONS

### A.   Acceptance of Responsibility

The government agrees that the Defendant's base offense level should be decreased by three points pursuant to Section 3E1.1 of the Sentencing Guidelines. She entered a guilty plea, thereby

admitting the conduct comprising the offense, and she has cooperated in the pre-sentence investigation. Accordingly, the government is moving the Court to grant a three-level decrease in the offense level pursuant to § 3E1.1 of the Sentencing Guidelines.

    B.        Application of the Federal Guidelines post-Booker

Pursuant to the plea agreement between the government and the Defendant, the Court should impose a sentence at the low end of the guidelines range. In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1). Booker, 125 S. Ct. at 756. However, the Court expressly refused to invalidate the Guidelines in their entirety. To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines. See 18 U.S.C. Section 3554(c)(2). The sentence will then be subject to review by courts of appeals for "reasonableness." Id. at 769.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines. See Fed. R. Crim. P. 32(i)(3)(B) (Court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply

the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, 125 S. Ct. at 767 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)). In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se. Not only is a sentence within the Guideline range reasonable per se, but it also accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in 18 U.S.C. Section 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence.

See United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. Section 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court. Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history. See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the

Act was to reduce sentencing disparity."). Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See Booker, 125 S. Ct. at 764. Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section 3553(a) – provide the most concrete yardstick against which to measure what would be unreasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review. See 18 U.S.C. Section 3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reasons in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances. This is so, said the court in United States v. Wilson, 350

F. Supp. 2d 910 (D. Utah, 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at 912. A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, the government does not oppose the application of the Safety Valve provision in Section 5C1.2 of the Sentencing Guidelines. However, as explained further below, no unusual circumstances exist that warrant an exception to the preference for sentencing the Defendant within the Guidelines range calculated in the Presentence Report.. Therefore, the government respectfully recommends that the Court sentence the Defendant within the Federal Guidelines range to 51 months of incarceration.

   C.   Basis for Government's Sentencing Recommendation

The Defendant has received a substantial benefit from this plea, and all the leniency she

should receive is encompassed in the plea. The Defendant, who would have been subject to a mandatory minimum sentence of 10 years, received a two-level decrease in her offense level pursuant to Section 3B1.2(b), a three-level decrease pursuant to 2D1.1(a)(3), and a two-level decrease pursuant to 2D1.1(b)(9). The Defendant also received a three point decrease in her offense level as a result of her acceptance of responsibility. As a result, the Defendant's base offense level of 34 has been reduced to a total offense level of 24.

Although her criminal history is limited, and her role in the instant offense was limited, the Defendant aided and abetted the distribution of approximately 220 grams of cocaine base on seven separate occasions, each time within 1000 feet of a school. At least three of these distributions involved more than 50 grams of cocaine base. In the case now before the Court, the seriousness of the offense, and the need to deter such criminal conduct are among the factors that warrant a sentence within the Federal Guidelines range calculated in the Presentence Report.

IV.   **CONCLUSION**

Wherefore, the government respectfully requests that the Court sentence the Defendant at the lowest end of the Guidelines to a period of 51 months of incarceration.

        Respectfully submitted,

        JEFFREY A. TAYLOR
        United States Attorney
        D.C. Bar 498-610

        _____

        Precious Murchison
        Assistant United States Attorney
        Federal Major Crimes Section
        Maryland Bar
        555 4th Street, N.W.
        Washington, DC 20530
        (202) 307-6080
        Fax: 353-9414

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by first class mail to counsel for the Defendant, James Rudasill, Esquire, 717 D Street, N.W., Suite 310, Washington, D.C., 20004, and by facsimile, facsimile number 202-628-2881 on this 3rd day of April 2007.

        _____

        Precious Murchison
        Assistant United States Attorney